IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**RONNIE BRYANT AND PATRICIA BRYANT**                                                                          **PLAINTIFFS**

**VERSUS**                                                              **CIVIL ACTION NO. 1:07-CV-01126-LG-RHW**

**THE PRIME INSURANCE SYNDICATE, INC. and**                                 **DEFENDANTS**
**JOHN DOES 1 - 10**

___

**PLAINTIFFS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO FED. R. CIV. PROC. 50(b), ALTERNATIVELY FOR NEW TRIAL PURSUANT TO FED. R. CIV. PROC. 59(a)(1) AND FOR RECONSIDERATION OF SUMMARY JUDGMENT DENYING BAD FAITH PUNITIVE DAMAGES, PURSUANT TO FED. R. CIV. PROC. 60(b)**
___

Plaintiffs move herewith for Judgment Notwithstanding the Verdict or Judgment as a Matter of Law, pursuant to Fed. R. Civ. Proc. 50(b), alternatively for a New Trial, pursuant to Fed. R. Civ. Proc. 59(a)(1), and for Reconsideration of Summary Judgment Denying Bad Faith Punitive Damages, pursuant to Fed.R.Civ.Proc. 60(b), as follows, to-wit:

Fed. R. Civ. Proc. 50(b) provides that:

*If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment–or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged–the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:*

*(1) allow judgment on the verdict, if the jury returned a verdict;*
*(2) order a new trial; or*
*(3) direct the entry of judgment as a matter of law*

A motion for Judgment as a Matter of Law should be granted if "the facts and inferences

point so strongly in favor of the motion, that a rational jury could not arrive at a contrary verdict." Waymire v. Harris County, 86 F.3d 424, 427 (5th Cir. 1996) (quoting London v. MAC Corp. of Am., 44 F.3d 316, 318 (5th Cir. 1995)).  See also, Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617( 5th Cir. 2008).  The Court must consider all of the evidence presented, with all reasonable inferences in the light most favorable to the nonmoving party.  See, London v. MAC, *supra*.

Fed. R. Civ. Proc. 59(a)(1) provides that:

*The court may, on motion, grant a new trial on all or some of the issues–and to any part–as follows:*

*(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court*

A new trial may be granted, for example, if the district court finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in the course of the trial. Torns v. Pennington, 2008 U.S. Dist. LEXIS 69023 (N.D. Miss. Sept. 11, 2008) (citing Eyre v. McDonough Power Equip., Inc., 755 F.2d 416, 420-21 (5th Cir. 1985); Westbrook v. Gen. Tire & Rubber Co., 754 F.2d 1233, 1241 (5th Cir. 1985); Carson v. Polley, 689 F.2d 562, 570-71 (5th Cir. 1982); Martinez v. Food City, Inc., 658 F.2d 369, 372-74 (5th Cir. 1981); Conway v. Chem. Leaman Tank Lines Inc., 610 F.2d 360, 363 (5th Cir. 1980)). "In granting a new trial, the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party." Laxton v. Gap Inc., 333 F.3d 572, 586 (5th Cir. 2003). "A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence." Id.  Hardy v. City of Tupelo, 2009 U.S. Dist. LEXIS 103762; 107 Fair Empl. Prac. Cas. (BNA) 1281.

Fed. R. Civ. Proc. 60(b) provides that:

> *(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons*: ...
>
> *(6) any other reason that justifies relief*.

Whether to grant Rule 60(b)(6) relief rests within discretion of district court. In re Jones, (1992, CA5 Tex) 970 F2d 36, 23 FR Serv 3d 879. As noted by the Fifth Circuit, Rul 60(b), "seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.' Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 401 (5th Cir. 1981) (citing Bankers Mortgage Co. v. United States, 423 F.2d 73, 77 (5th Cir.), cert. denied, 399 U.S. 927, 90 S. Ct. 2242, 26 L. Ed. 2d 793 (1970)). Further, the rule should be liberally construed in order to do substantial justice." Id.

Plaintiffs contend that, under any of these standards of review, even the most stringent of the three procedural rules, the jury's verdict should not be allowed to stand. Thus, even viewed in the light most favorable to the Defendant, the greater weight of the evidence favors judgment for the Plaintiffs as a matter of law, or alternatively, a new trial, and/or relief from Order granting Summary Judgment and denying the claim for punitive damages. Reasons for granting Plaintiffs the requested relieve are set forth below.

## I. Jury Interrogatory No. 1, 'Was there a Breach of Contract?'

Plaintiffs contend that the evidence, viewed even in the light most favorable for the Defendants, supports no other rational conclusion other than that the Defendant, Prime Insurance Syndicate, breached its contract with the Plaintiffs. The jury was clearly charged in this case that under Mississippi law, if they found that the Bryants were likely to require a general contractor's

services to perform their repairs, then the Defendant was required to pay the Plaintiff general contractor overhead, profit, and sales tax REGARDLESS of whether the Bryants actually repaired the home.  Clearly, the uncontradicted evidence of the 35 foot hole in the Bryants' roof, which would require roof framing and decking repairs, sheetrock, paint, flooring and structural repairs to the floor joists, among other miscellaneous repairs, would likely require a general contractor's services.  Indeed, the appraiser for Prime allowed for general contractor overhead, profit, and sales tax, albeit, *over two years* after the storm, and after Plaintiffs home had deteriorated to the point of a total loss. *See*, C&G repair estimate, Ex. P-48.  Prime admits that it did not pay general contractor overhead and profit in it's initial payment made in November of 2005.  Thus, if the jury had followed the Court's instruction, no rational juror could have failed to conclude that Prime's refusal to include general contractor overhead and profit with their initial actual cash value payment was a breach of contract.

Because the jury interrogatories for damages were separate and the jury was instructed to proceed no further if they answered the first question regarding whether there was a breach in the negative, there is no way of knowing whether the jury misunderstood or refused to regard the Court's instructions regarding overhead and profit or whether they merely did not wish to award the Plaintiffs damages for other reasons. For this reason alone, the verdict should be set aside and a ruling in favor of the Plaintiffs on the breach of contract issue should be rendered as a matter of law.

Further, the irrefutable evidence in this case shows that Plaintiffs suffered damages as a result of Prime's breach of contract.  Viewed in the light most favorable to the Defendant, the actual cost to repair the actual direct storm damage to Plaintiffs' home was *at least*, by Prime's own appraisal, $63,394.97.  *See*, C&G repair estimate, Ex. P-48, and testimony of Leonard

Quick.

Mr. Bryant testified that he purchased the property in 2004, approximately a year before Katrina for $107,000.00 and that he believed the value of the home at *that* time was $85,000.00, and that is why he purchased $85,000.00 in insurance on his dwelling. Mr. Bryant also testified that he had invested approximately $30,000.00 in upgrades to the home prior to Katrina. Although Prime offered no witness testimony whatsoever as to the home's value, their initial adjuster's estimate of the replacement value of the home was $73,500.00, and with depreciation, the value of the home in his opinion was $58,800.00. Prime's in-house adjuster apparently felt the value of the home was higher. Prime's own dwelling adjustment worksheet prepared by Mr. Horner estimated the replacement cost value of the home as $85,040.00. *See* Ex. P-20. Applying depreciation of 20%, which is the depreciation factor used by Mr. Favre, the depreciated value of the home would be $68,032.00. Thus, although Plaintiffs contend that the home was actually worth a good bit more, *viewed in the light most favorable to the Defendants*, the value of the home was at *least* $58,800.00, based on David Favre's initial estimate.

Based on the totally uncontradicted evidence, viewed in the light most favorable to the Defendant, the cost to repair the Bryants' home, even before there was any deterioration caused by delays from whatever source, was *more* than the home was worth, according to Favre's report, ($63,394.97 > $58,800.00) and alternatively, based on the Horner Dwelling Adjustment worksheet, the cost to repair was at least 93% ($63,394.97 divided by $68,032.00) of the value of the home at the time of the storm.

Mr. Leblanc testified that, from an engineering standpoint, if the cost of repairing a home is more than **50%** of its' value, then repair is not economically feasible. Mr. Leblanc was the *only* engineer allowed to provide the Court and jury with *any* engineering opinions. The parties

stipulated that, although Mr. Quick is a licensed engineer in Louisiana, he would *not* be offering any engineering opinions, *only* appraisal opinions. Mr. Quick did not ever purport to provide any appraiser opinion regarding whether it was economically feasible to repair the home. Mr. Murray also admitted that Prime *never evaluated* the damage to the Bryants' home to determine if it was a total loss. Thus, the evidence **most** favorable to the Defendant, regarding whether the Bryants' home was a total loss irrefutably establishes that the Bryant home was damaged beyond economically feasible repair. Based on the *lowest* estimate of the depreciated value of Mr. Bryant's home, the house would cost *more* than it was worth to repair it, or, based on the next highest estimate of the home's depreciated value, it would cost 93% of the value of the home to repair it.

Section IV.B.2 of the policy states that "When the loss or damage to the property creates a total loss, Actual Cash value means the market value of the property in a used condition equal to that of the destroyed property." The policy does not define "total loss", therefore,"any ambiguities in an insurance contract must be construed against the insurer and in favor of the insured and a finding of coverage." Burton v. Choctaw County, 730 So. 2d 1 (Miss. 1997). Here, the only expert testimony there is concerning the definition of a "Total loss", is Mr. Leblanc's definition, where the cost of repair is more than 50% of the value of the home. However, when the value of the home is viewed in the light most favorable for the Defendant, the cost of repair is more than the value of the home, $63,394.97 > $58,800.00.

Therefore, based on the foregoing, and viewed in the light most favorable for the Defendants, at the very least, $4,540.51 or, $58,800.00 (Favre's estimate of depreciated value of the house) minus the dwelling payments made of $54,259.49 is owed the Bryants, and no rational juror could conclude otherwise. Frankly, even if one were to *ignore* Prime's blatant refusal to

pay its' insureds general contractor overhead and profit, Plaintiffs irrefutably established Prime's breach based on nothing other than the C&G estimate showing the cost of repair, $63,394.970, and Prime's initial adjuster's estimate showing the value of the home as $58,800.00. The uncontradicted evidence is that the home was beyond economically feasible repair and thus a total loss, which would require Prime to pay at least the market value of the home, which it has not done, even when viewed in the light most favorable for the Defendant.

## II. Jury Interrogatory No. 2 'Was the Full and Final Settlement Language on the Check a Tortious Breach of Contract?'

Because the jury answered the first of the Interrogatories in the negative, it is unknown whether they would have concluded that Prime lacked an arguable basis for including the restrictive endorsement on the Bryants' initial check. However, this Court has already seriously questioned Prime's policy of restrictively endorsing their checks in its' rulings on the Motion for Summary Judgment. Although the Court determined this policy did not warrant punitive damages, because the Court found in its' rulings on Motion for Summary Judgment that Prime did not provide an arguable basis for the restrictive endorsement, the Judge allowed the Plaintiffs to assert claims for extra-contractual damages. Nothing changed regarding Prime's lack of an arguable basis at trial, indeed, if anything, the excuses were even worse.

At the close of all the evidence submitted at trial, Plaintiffs filed herein a Motion for Judgment as a Matter of Law and for a reconsideration pursuant to Fed. R.Civ. Proc. 60(b) of the Court's grant of summary judgment in favor of Prime on the punitive damages issue. Plaintiffs reiterate and re-aver all of the allegations and arguments set forth in that Motion as if copied herein in their entirety. In summary, Plaintiffs noted in that Motion that, based on Mississippi law, the consequence of cashing a check endorsed "full and final settlement" on a disputed debt

is a discharge of the debt. *See* MCA §75-3-311. All of the checks sent out to Prime's insureds that were restrictively endorsed were also accompanied by a General Release, Proof of Loss and a letter which, when read together as a whole, clearly indicated that Prime contended the initial payment was all it owed and that the insureds were not entitled to any further sums or supplemental claims. If the insured agreed with Prime's figures they were advised to sign and return the Release and Proof of Loss, but if they disagreed with Prime's figures, there were no instructions. Clearly, these documents created a dispute over the amount owed if the insured did not return the signed Release and Proof of Loss, and thus, if the insured cashed the check anyway, despite the endorsement, his or her debt would be discharged under Mississippi law. Plaintiffs submit that the legal consequences that would result from any of Prime's insureds actions cashing their initial "full and final settlement" checks lend credence to the argument that Prime's actions were NOT merely negligent but were an intentional, if not a gross and wanton, disregard of the Plaintiffs' rights to receive an unconditional tender of amounts undisputedly owed under the policy and that in light of Prime's total failure to provide any further explanation of their restrictive endorsement 'habits', Plaintiffs should be granted relief from this Court's summary judgment order denying bad faith punitive damages pursuant to Fed.R.Civ. Proc 60(b).

   Alternatively, although the Plaintiffs continue to assert that Prime's actions were *intentional and in bad faith,* even when viewed in the light most favorable for the Defendants, no rational juror could possibly conclude that Prime had an arguable basis for their actions. In fact, although Prime's argument is that some clerical person forgot to change the default on their computer that is used to print all of their claims checks, which are mostly based on third-party liability policies, the fact of the matter is that *someone* had to purposely type in the words at the end of "Full and Final Settlement..." that say "...of all Dwelling claims arising on or about

8/29/05".  That is a specific unique date attributable to Hurricane Katrina and it is inconceivable that any rational person could think the *default* for *all* of Prime's *liability* claims says full and final settlement "...of all Dwelling claims arising on or about 8/29/05".  As a matter of fact, Prime's argument that this endorsement came about as a result of a computer default is so patently false as to amount to perjury and a fraud on the Court.

Further, the fact that Prime's restrictively endorsed check was accompanied by a "General Release of all *Property Damage* claims" lends support to the Plaintiff's view that Prime's restrictive endorsement was intentional.  Even though Prime contends that they merely used forms like they use in other liability cases when they sent out the initial Hurricane Katrina checks, a closer review of the documents refutes this position.  The Release of *Property Damage* claims makes absolutely no mention of a third party being released, as would be the case if these forms were just mistakenly based on the usual liability claims. The only party the document purports to release is Prime, CDA and their officers, etc.

The Proof of Loss which the Bryants were also asked to sign is not one typically used in liability claims and is unique to the first-party indemnity policies like the homeowner policies here at issue.  The Proof of Loss states that the listed actual cash value in the amount of the initial check "...constitutes a full and complete list of the damaged/destroyed property associated with this loss."  It further states that "...the undersigned acknowledges that before any payment is made under the terms of the Policy, the insurer may require the insured party to sign a General Release of All Property Damage claims." The Proof of Loss goes on to state that by paying the amounts in the Proof of Loss, Prime is not acknowledging the claim is covered and that "...Prime is not waiving any of its rights or coverage defenses which it may have under the policy, by law, otherwise.  These rights and defenses are hereby expressly reserved.

The letter accompanying the Bryants' initial check with the restrictive endorsement identifies the check as a "settlement check" and states that, if, after review of the documents attached the insured agrees with Prime's figures they are to sign and notarize the Proof of Loss and General Release and return them to Prime. No instructions are given regarding what to do with your check, the Proof of Loss and the Release if you disagree with Prime's figures.  The letter also specifically states that Prime reserves all of its rights and defenses and it actually goes further to define for the insureds the actual cash value payable under the policy as "the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration, and obsolescence."  Nowhere in any of the documents provided by Prime is there any indication to the Bryants or the other Prime insureds who received these forms that they might be entitled to general contractor overhead, profit and sales tax. As a matter of fact, everything about this package would lead one to believe that Prime was clearly taking the position that this is all they will ever owe the insureds under the policy.  It is clear that, all of these documents, when viewed together as a whole, have been carefully drafted to cover the Katrina indemnity claims and no rational juror could possibly conclude that these are the same types of forms used to settle a third party liability claim.

Despite the irrational and implausible excuse Prime has crafted after the fact to explain its' restrictive endorsement on ALL of the Katrina insureds' initial payment checks, the great weight of the evidence, even viewed in the light most favorable to the Defendants, can support no rational conclusion other than that Prime lacks an arguable basis for the endorsement.  Prime did assert that it never intended to enforce the "Full and Final Settlement" language on the checks and that they would not have enforced their rights if their insured had signed the Proof of Loss and Release and later realized there was more damage.  If one accepts Prime's assertion that

they would not have enforced the restrictive endorsements or the Proof of Loss/Releases, then the only *rational* explanation for Prime taking the trouble to carefully draft and send out supposedly useless documents, would be that Prime wanted their insureds to BELIEVE that Prime would have no further liability if they cashed their "settlement" checks, *and* Prime was trying to fraudulently conceal the fact that many of its' insureds were entitled general contractor overhead, profit and sales tax. Logically, if an insured were desperate or foolish enough to cash the check and/or sign the other documents, thinking the check was enough, and later learned perhaps that repair costs were greater or that they needed a general contractor, the insured would probably assume that they had already "settled" their claim. This is why Prime drafted and sent insureds checks, Releases and Proofs of Loss that they claim they never intended to enforce. There is no telling how many of Prime's insureds have been discouraged from pursuing a supplemental claim based merely on the fact that they cashed a check that was endorsed "Full and Final Settlement" and/or signed Proofs of Loss/Releases.

   The jury was instructed herein that every contract contains an implied duty of good faith and fair dealing. Further, an insurance company clearly has an obligation to promptly and unconditionally pay undisputed amounts owed. *See*, Travelers Indem. Co. v. Wetherbee, 368 So. 2d 829 (Miss. 1979). Prime's restrictive endorsement and request that its' insureds execute Releases and Proofs of Loss limiting the amount of their claims is similar to the factual scenario in Murphree v. Federal Insurance Co., et al., 707 So.2d 523 (Miss. 1997). In Murphree, the insurance company failed to pay the appellant's attorney fees incurred in a criminal proceeding which had resulted in an aquittal. The insured was initially asked to execute a general release from all claims before the insurance company would make payment. The Court acknowledged that an insurer cannot withhold payment of undisputed amounts owed in order to negotiate a

settlement, citing <u>Wetherbee</u>.  Further, as explained in the dissent, an insurer cannot enter into a contract with its insured and then, once a claim has been filed, require the insured to abide by additional provisions no contemplated when the agreement was made.  *See* <u>Murphree</u>, *dissenting opinion, citing*, <u>Wetherbee</u>.

The Court in <u>Murphree</u> upheld the trial court's grant of summary judgment dismissing the insured's claims for punitive damages because when that insurance company sent out the General Release, the defendant had already been threatened with litigation regarding the matter, and within *five* days of requesting the release, the insured was advised that the release was not a condition of payment.  Our case involves a disputed issue of fact over whether the insured was advised on the phone that he could cash his check without prejudice as to his right to make a supplemental claim, but in any event, there was no written assurance that the Bryants could cash their check until *five months* after the initial checks were sent.  Here the insurance company was never threatened with litigation prior to sending out 800 or 900 checks endorsed "Full and Final Settlement of all Dwelling Claims arising on 8/29/05", their paperwork clearly stated that Prime reserved all rights and defenses, and Prime continues to blatantly send out indemnity checks on first party claims endorsed with "full and final settlement", along with Releases and Proofs of Loss.  Further, Prime did not lift a finger to send out any letter to their insureds, as a whole, advising them of the alleged unintentional use of the endorsement.  Indeed, unless an insured called and said the magic words, 'I don't like the full and final settlement language on the check', they were not even verbally advised that they might be entitled to general contractor's overhead and profit or told to cash the check and make claim later for additional funds. Under any fact scenario presented, Prime lacks an arguable or justifiable basis for sending the Plaintiffs, not *only* a check marked "Full and Final Settlement", but *also* a Release, a Proof of Loss, and written

instructions to execute those forms *if* the Plaintiffs agree with the amount of loss.

      As a result of Prime's tortious breach of contract, Plaintiffs have clearly suffered, as demonstrated above, the total loss of their home. Additionally, even viewed in the light most favorable for the Defendant, the great weight of the evidence has shown that Plaintiffs suffered extra-contractual damages as a result of Prime's tortious breach of contract. There was uncontradicted expert testimony at trial, by David Dye, that the depreciated value of Plaintiffs' home was $108,000.00 and Plaintiffs contend their extra-contractual damages on the dwelling structure are in the nature of that amount minus the $54,259.49. However, as outlined above, when viewed in the light most favorable to the Defendant, the great weight of the evidence demonstrates there was *at least* another $4,540.51 owed on the dwelling. Further, even viewed in the light most favorable to the Defendant, Plaintiffs proved they suffered extra-contractual damages on their contents claim. Plaintiffs' Proof of Loss valued their destroyed contents claim as $40,000, without depreciation. Further, Plaintiffs testified that the Proof of Loss did not include all of their damaged contents. Yet, Plaintiffs were paid only the policy limits of $25,000.00 on their contents. Prime's contents appraisal merely took the Proof of Loss submitted by the Plaintiffs' public adjuster and cut back the costs of the content items and applied depreciation "heavily" to 'allow room for negotiation'. Nevertheless, when viewing the evidence in the light most favorable for the Defendant, Prime's appraisal lists the replacement cost value of Plaintiffs' contents at $30,894.55. Thus, at the very <u>least</u> Plaintiffs would be owed $5,894.55 in extra-contractual damages in order to be made whole on their destroyed contents claim.

      In addition to these limitations on their damages, Plaintiffs were limited to payment of only $500 for removal of the tree from their home, which was paid more than *two and half* years after Hurricane Katrina, solely as a result of the Plaintiffs hiring attorneys and filing suit.

Plaintiffs submit that, even viewed in the light most favorable for the defendant, there is no excuse for Prime's delay in payment of these amounts to remove a tree that created a 35 foot hole in their roof. Even viewed in the light most favorable to the Defendants, no plausible excuse was provided for Prime's failure to include at least $500 for removal of that tree in the initial estimate prepared by David Favre. And although Prime attempted to criticize the Plaintiffs for not providing a receipt for reimbursement of that expense, Prime has a clear duty to investigate the claim. Prime knew from the very beginning that a tree caused substantial damage to the home, and indeed, they were provided photographs and information in Mr. Favre's estimate that would clearly indicate a large tree such as the one that impacted the Bryant home would require at least the limits of $500 for removal. Yet, Prime did nothing, asked for no receipts nor tendered any amount in payment for removal of the tree until the Plaintiffs were forced to hire an attorney. Nowhere throughout the entire trial was any excuse provided for this failure to pay for tree removal. Even if Prime did require receipts for reimbursement of these expenses, Prime cannot sit back and knowingly rely upon an estimate from their adjuster that fails to include these damages, with full knowledge the tree had to be removed at some cost, and just hope that the Bryants never figured out that the reason they weren't paid is they didn't submit a receipt. Not one person sat on the stand and suggested that the Bryants were ever asked to provide a receipt for this item of damage in order to be reimbursed. Further, although at trial Prime did question Ms. Bryant why she wrote out the receipt for the workers who removed the tree from their home, she explained that the people who removed the tree were not well organized business people who are in the habit of providing and writing out receipts, so she wrote the receipt out at their request. However, not once did Prime ever question the validity of receipt for the tree removal at any time

before trial. So, apparently, the receipt was sufficient evidence for Prime to finally cave in and pay the $500 for removal of the tree, two and a half years after the hurricane, but if the Plaintiffs were going to ask for reimbursement of the entire cost of tree removal, they wanted an excuse for not paying those damages. Even viewed in the light most favorable for the Defendants, this failure to reimburse the Plaintiffs for tree removal expenses until they had to hire an attorney two and half years later was a clear breach of contract. Not only is this a contractual breach, this is the epitome of bad faith, and if the Plaintiffs were not entitled to one other penny of damages, it would be a clear miscarriage of justice to refuse to compensate the Plaintiffs for extra-contractual damages and punitive damages for Prime's actions in this regard.

In summary, at the very least, viewed in the light most favorable for the Defendant, no rational juror could help but conclude that Prime breached their contract by failing to pay general contractor overhead, profit and sales tax for over two years, during which time the Plaintiffs' home was substantially destroyed, and/or by failing to pay Plaintiffs the market value of their home, as it was a total loss, and by failing to pay for removal of the tree that put a 35 foot hole in their roof until after Plaintiffs were forced to hire an attorney. Further, no rational juror could help but conclude that Prime's endorsement of their initial check for amounts undisputedly owed under the policy with the words "Full and Final Settlement of any and all Dwelling claims arising on 8/29/05", accompanied by the Release and Proof of Loss, was without an arguable basis and thus a tortious breach of contract. For these reasons, Plaintiffs request relief from the jury's verdict pursuant to Fed.R.Civ.Proc. 50(b), 59(a)(1) and 60(b).

Respectfully submitted, this, the 17th day of February, 2010.

By: /S/ Virginia L. LoCoco
**VIRGINIA L. LOCOCO, MBN # 8483**
**IAN L. BAKER, MBN # # 102272**
**LOCOCO & LOCOCO, P. A.**
**10243 CENTRAL AVENUE**
**POST OFFICE BOX 6014**
**D'IBERVILLE, MISSISSIPPI 39540-6014**
**(228) 392-3799 TELEPHONE**
**(228) 392-3890 FACSIMILE**

### CERTIFICATE OF SERVICE

I, Virginia L. LoCoco, attorney for RONNIE BRYANT AND PATRICIA BRYANT, do hereby certify I have electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to:

> Mr. Justin L. Matheny, Esquire
> Mr. Ross F. Bass, Jr., Esquire
> Mr. James W. Shelson, Esquire
> PHELPS DUNBAR, L.L.P.
> 111 East Capitol Street, Suite 600
> Post Office Box 23066
> Jackson, Mississippi 39225-3066

SO CERTIFIED, this the 17th day of January, 2010.

/S/ Virginia L. LoCoco
**VIRGINIA L. LOCOCO, MSB # 8483**
**LOCOCO & LOCOCO, P. A.**
**10243 CENTRAL AVENUE**
**POST OFFICE BOX 6014**
**D'IBERVILLE, MISSISSIPPI 39540-6014**
**(228) 392-3799 TELEPHONE**
**(228) 392-3890 FACSIMILE**